# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARY GLOVER, | ) |
| Plaintiff, | ) |
| | ) No. 07 C 5791 |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) HONORABLE DAVID H. COAR |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

An administrative law judge denied Plaintiff Mary Glover's request for Social Security Disability Insurance benefits (SSDI) and Supplemental Security Income disability benefits (SSI). Glover now asks the court to vacate the ALJ's decision, which she asserts is not supported by substantial evidence, nor in accordance with law. *See* Fed. R. Civ. P. 56; 42 U.S.C. §405(g). In the alternative, she seeks a remand for consideration of new and material evidence under 42 U.S.C. §405(g). Commissioner Michael Astrue, meanwhile, has filed a cross-motion for summary judgment, asking this court to affirm the ALJ's ruling. For the following reasons, the court DENIES Glover's motion and GRANTS Commissioner Astrue's motion.

## I. BACKGROUND

Mary Glover applied for disability insurance benefits and for supplemental security income in 2003,[1] alleging a disability onset date of June 1, 2001. Her applications were denied initially and upon reconsideration. (AR 16.)

---

[1] The record contains conflicting dates for her applications, ranging from March 17, 2003 to September 19, 2003. The official dates are unclear, but not relevant to the court's decision.

-1-

On March 7, 2006, Glover appeared with counsel at a hearing before an administrative law judge. (AR 17.) There, she argued that her asthma, obesity, back and knee pain, and depression limit her to sedentary work, for which she lacks appropriate skills. (AR 16, 575-76.) The ALJ heard testimony from medical experts Walter J. Miller, Jr., M.D., and Kathleen M. O'Brien, PhD; vocational expert James Breen; and Glover. (AR 571-626.)

Dr. Miller's Testimony

Dr. Miller testified that Glover did not have a "clear cut determinable impairment." (AR 579.) He opined that her asthma restricted her activity, but not severely. (AR 582-83.) He noted Glover's history of attacks and hospitalizations, but also explained that her air-exchange studies were normal. (AR 580.) And he judged that the condition was not permanent because Glover did not have an elevated carbon-dioxide level in her lungs, a feature typical of secondary scarring. (AR 580.) Dr. Miller acknowledged that Glover had somewhat decreased pulmonary function, but he did not consider the results of some of the pulmonary tests reliable because they showed a decreased forced expiratory volume after she used a bronchodilator—a result that Dr. Miller opined could occur only if the test was not properly administered, or if Glover had not cooperated. (AR 582-83.)

As for Glover's back pain, Dr. Miller opined that there was no evidence in the record that she was severely disabled or restricted by the condition, which he described as secondary arthritis. (AR 580-81.) Although her MRI showed some disc narrowing, Dr. Miller noted that there was neither a clear herniation nor pressure on the nerve roots that would result in pain. (AR 580.) Meanwhile, Dr. Miller judged Glover's knee condition to be osteoarthritis, although evidence of it was not very extensive. He noted that there was no MRI evidence showing any

marked change of the cartilage or ligaments. (AR 581.)

In considering Glover's obesity, Dr. Miller noted that her listed weight of 220 pounds, because it was not 100 pounds more than normal weight, suggested that she is not morbidly obese. (AR 581.) (Dr. Miller did not revise this assessment after hearing Glover's testimony that she was 5'3" or 5'4" and weighed 257 lbs. (AR 608, 622.)) Dr. Miller added that Glover had no serious cardiovascular disease, had an asymptomatic brain lesion (cysticercosis), and that, although she had undergone multiple surgeries of the gallbladder and ovaries, the underlying abdominal conditions had been treated. (AR 580-81.)

Finally, Dr. Miller opined that Glover could stand and/or walk for at least six hours of an eight-hour workday. (AR 583.) He said that she could not do heavy work, and would be "somewhat limited," but could "get up and down at will" and wouldn't need to be restricted to sitting. (AR 583, 586.) When the ALJ pressed him on whether Glover could do that on a sustained basis, Dr. Miller noted that Glover's arthritic pain in her back and knee might be alleviated with more physical activity. (AR 587.) He acknowledged, however, that standing for six hours a day, every day, "might be more than she could handle, that's possible." "But," he added, "I think that would have to be tried out to see. So I know I'm sitting here at a hearing and I have to make a judgment so, you know, maybe she would be sedentary." (AR 588.)

<u>Dr. O'Brien's Testimony</u>

Dr. O'Brien, meanwhile, testified that Glover had a history of anxiety and depression that predated her alleged disability onset.[2] (AR 595.) She noted that Glover's primary-care

---

[2] At the hearing, Glover requested that her disability onset date change to October 1, 2001, and the ALJ granted the request. Glover's history of anxiety and depression predate both that date and the June 1, 2001 date identified in her applications.

physician had been treating those conditions since 1998, and that there was no evidence that she had been referred to a psychiatrist or psychologist, nor that Glover herself had sought psychiatric care. (AR 595-96.). Dr. O'Brien noted that, despite medication, Glover had not reported great relief of her symptoms, including her purported insomnia. (AR 596.) Dr. O'Brien said she had considered a disability evaluation from 2004 that described Glover's capabilities as inadequate in activities of daily living, social functioning, concentration, persistence, and pace, with one or two episodes of decompensation. (AR 598-99.) But she noted that another evaluation from that same year said Glover had been "very appropriate, alert, oriented . . . cooperative, serious, polite," had not shown memory or concentration difficulties, and displayed "appropriate hygiene and dress[.]" (AR 599.) Considering the medical evidence in the record, Dr. O'Brien opined that there was no evidence that Glover's psychological symptoms would affect her ability to perform "the universe of work-related activities." (AR 599.)

Glover's Testimony

Glover testified that she had a seventh-grade education; she said she had lied in her application about having a GED out of embarrassment. (AR 602.) Glover testified that she had trained to be a certified nursing assistant, but that she did not take a final examination. She admitted that she falsified a certificate so that she could work as a nursing assistant. (AR 603-06.) Glover further testified that she had worked at a video store in 2001 but quit after two weeks because she could not stand long enough to perform the job. (AR 607-08.) She said she had also held a job packing boxes, and in 2002 she provided patient care for a month. (AR 612.)

Glover testified that, since her application, she had gained 37 pounds, which she attributed to eating late at night because she could not sleep. (AR 609.) Glover said her asthma

caused shortness of breath when she climbed stairs or did chores around the house (like vacuuming, or carrying laundry up and downstairs). (AR 614, 619.) She said she would have to rest for 5-10 minutes after walking halfway up the stairs in her home. (AR 615.) Glover said she could wash dishes, cook breakfast, and shop, but that she could stand only for 15-30 minutes before having to sit down. (AR 619.) She testified that she would then have to rest for 45-60 minutes before getting up again. (AR 619.)

Glover testified that she lived with her son and his family, had no income or health insurance, and was supported by her son. (AR 608.) She did not have a driver's license, did not use public transportation, and relied on her son if she needed to go somewhere by car. (AR 610-11.) She left the house about two or three times a week—usually to see a doctor or go to church. (AR 620.) She said she could walk a half block before her legs hurt. (AR 619.) Glover testified that both of her knees bothered her, the left moreso than the right. (AR 616.)

Glover testified that she had trouble sleeping, had been hearing voices for 3-4 years, and had nightmares about her childhood. She testified that she had received psychiatric treatment for approximately six months in 2005, but stopped because she did not feel it was helping. She said she began seeing a psychiatrist again in 2006 because her symptoms worsened, and that she was currently seeing a psychiatrist and taking psychotropic medication. (AR 609-10.)

Glover testified that her treating physician, Judith Sherman, M.D., had prescribed medication for asthma, acid reflux, and her knee and leg problems. (AR 612-13.) She said her pain medication eased, but did not eliminate, the pain. (AR 617.) Glover testified that she had an asthma attack every two to three months, and that she would go to Dr. Sherman for a nebulizer treatment when she had attacks. (AR 613-14.) Glover also said she had been on

medication for hypertension. (AR 614.) And she testified that Dr. Caruso, an orthopedic specialist, had told her in the previous month that she had a pinched nerve (sciatica), from her buttocks to her legs. (AR. 616.)

Breen's Testimony

Vocational expert Breen testified that Glover is closely approaching advanced age with a limited education. He noted that her past relevant work history included semiskilled, medium work as a nurse's assistant; unskilled, medium-to-heavy work as a packing machine operator; and unskilled, light work as a cashier at a video store. (AR 624.) Breen testified that, if Glover were restricted to light physical exertion, she would be able to work as a cashier. (AR 624.)

Post-Hearing Submissions

At the end of the hearing, the ALJ granted Glover's request for 30 days to submit additional medical evidence, including her mental-health records. Glover's attorney explained that he had not submitted these records prior to the hearing because he had learned only the day before that Glover had begun psychiatric treatment in February 2006. (AR 17, 574, 625.)

On March 20, 2006, Glover's attorney submitted medical records covering the period from June 3, 2004 to April 12, 2005. In a letter accompanying the materials, he noted that he was still awaiting her mental-health records and a new evaluation from her treating physician, but he did not request additional time to submit them. (AR 417.) On April 11, 2006—more than 30 days after the March 7 hearing—Glover's attorney sent the additional records to the wrong address. (AR 504.) The ALJ did not receive the second batch of evidence prior to his decision.

The ALJ's Decision

On October 23, 2006, the ALJ denied Glover's claims. The ALJ concluded that, although Glover had at least one severe impairment, she was able to perform a significant number of jobs in the national economy. (AR 13-25.)

The ALJ found that (1) Glover had not engaged in substantial gainful activity at any time since she applied for SSDI and SSI benefits; (2) she had three severe medical impairments: asthma, osteoarthritis of the left knee, and obesity; (3) her medical impairments did not meet, nor medically equal, any of the listed impairments; (4) she could not perform her past relevant work as a nurse or a packing-machine operator, nor were her acquired vocational skills transferable; but (5) she could perform a range of light work in a significant number of jobs that are available in the national economy. (AR 19-25.)

Regarding Glover's mental-health condition, the ALJ noted that she had not submitted any mental-health records, and that, based on the evidence available to Dr. O'Brien, the expert had concluded that Glover's impairments were not severe. (AR 20.) The ALJ concluded that Glover had experienced "mild limitations in activities of daily living, social functioning, concentration, persistence, and pace, with no episode of decompensation or deterioration." (AR 21.) He credited Dr. O'Brien's opinion that Glover's psychological impairments would not limit her ability to perform the universe of work-related activities.

In assessing Glover's residual functional capacity (RFC), the ALJ considered the combined effects of Glover's impairments, but he did not credit Glover's testimony about the frequency and duration of her intense symptoms. (AR 21.) As a general matter, the ALJ thought Glover's falsification of her nursing certificate demonstrated her willingness to lie to obtain what

she wants. (AR 24.) And, more specifically, the ALJ did not believe Glover's testimony that she experienced asthma attacks approximately four times per year and went to her doctor when they occurred. The ALJ concluded that the medical evidence showed that she would go to an emergency room with such complaints, and not as frequently as she alleged. The ALJ also noted that Glover's testimony about the duration of her steroid treatment was not supported by the medical evidence. (AR 22.) And the ALJ credited Dr. Miller's testimony about Glover's normal air-exchange studies, the unreliability of her pulmonary function tests, and his opinion that her asthma attacks were infrequent and her condition was not medically severe. (AR 22.)

The ALJ said he had considered the impact of Glover's obesity on her respiratory and musculoskeletal systems, but had not considered the impact of deconditioning, which he said was not a medically determinable impairment. (AR 21.) Regarding Glover's claimed difficulty walking, the ALJ noted that Dr. Miller had testified that the medical evidence suggested anatomical abnormalities that would produce some pain, but not as much as she alleged, and that the pain would decrease with movement. (AR 22.) He added that the medical evidence did not support her complaints of lower back pain. (AR 22-23.) Furthermore, the ALJ did not credit Glover's testimony about leaving a video-store job in 2002 because she could not stand long enough to perform the job; he noted that her documented complaints of knee pain arose later. (AR 23.)

The ALJ said he had considered Glover's ability to obtain health care, noting that, despite her testimony that she did not have insurance, "in February and March 2002, when she presented to a hospital's emergency room, she reported that she was then-employed and covered by health insurance." (AR 22.) He noted that, after Glover obtained a medical card, her diagnostic

-8-

evaluations "were essentially benign" and her diagnostic work-ups were thorough. (AR 22.) The ALJ also said that he had credited the Administration's physician-consultants' assessment that her diagnosis was relatively benign. (AR 23.)

The ALJ noted that the reviewing physician consultants had opined that Glover was limited to the full range of medium work, although much of the evidence available to them was historical in nature. (AR 21.) He also noted that Dr. Miller had "opined that the claimant's physical impairments, even in combination, would not be expected to reduce the claimant's ability to stand and/or walk to less than 6 hours in an 8 hour workday, although he clearly described sedentary work as what he contemplated the claimant performing on a sustained basis, and stated that 'maybe' the claimant was limited to sedentary work." (AR 23.) The ALJ wrote that he was not convinced by these medical opinions, however, and concluded instead that Glover is "limited to light work . . . that does not involve concentrated exposure to pulmonary irritants or temperature extremes[.]" (AR 23.) The ALJ explained that he was "not convinced that the occupational base of light work has been so degraded that the claimant would be unable to perform other work at that level of exertion." (AR 25.)

Post-Decision Submission

After receiving the ALJ's decision, Glover's attorney realized that the ALJ had not received the second batch of evidence. In a letter dated November 1, 2006, he explained to the ALJ that he had sent the evidence to the wrong address and asked that the decision be vacated based on the entire record, including the additional evidence. (AR 507-08).

Receiving no response to the letter, Glover sought review from the Appeals Council. She asked for additional time to file a statement and additional medical records, which was granted.

(R. 9-12.) On January 17, 2007, she submitted that statement along with the mental-health records that the ALJ had not considered. (AR 498-570.)

On August 10, 2007, the Appeals Council denied Glover's request for review and designated the ALJ's October 23, 2006 decision as the final decision of the Commissioner. (AR 5-8.) The Appeals Council also explicitly made the mental-health records part of the record. (AR 8.)

## II. STANDARD OF REVIEW

In reviewing the denial of applications for social-security income and benefits, this court may affirm, modify, or reverse the Commissioner's decision with or without remanding the cause for rehearing. 42 U.S.C. §405(g) sent. 4. This court may not, however, substitute its judgment for that of the ALJ by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding issues of credibility. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). If the ALJ's findings are supported by substantial evidence, this court will not disturb them. 42 U.S.C. §405(g) sent. 5; *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

## III. ANALYSIS

### A. Dr. Miller's RFC Conclusion

Glover first argues that the ALJ rejected, without explanation, Dr. Miller's opinion about her ability to perform non-sedentary work on a sustained basis. She adds that, as a result, the ALJ's assessment that Glover was capable of performing light work is unmoored from the medical evidence.

An ALJ must articulate, at some minimum level, his analysis of the evidence. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). And he must "confront evidence that does not support his conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474. Additionally, the ALJ "must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Unfortunately for Glover, her contention rests on a faulty premise: that Dr. Miller's testimony supported her claim that she could not perform non-sedentary work on a sustained basis. In fact, Dr. Miller did not commit to that opinion; he simply suggested that it was "possible." And the ALJ did not reject outright Dr. Miller's opinion; he said only that he was not "convinced" by it, and for obvious reason: it was highly equivocal. It was not unreasonable for the ALJ to give little weight to Dr. Miller's non-committal opinion about Glover's ability to sustain non-sedentary work, particularly after Dr. Miller had said, prior to being pressed, that he thought Glover *could* sustain such activity. (AR 584-86.) The court also does not read the ALJ to have dismissed Dr. Miller's *entire* opinion, as Glover contends in her reply. Rather, it's clear from the ALJ's opinion that he credited virtually all of Dr. Miller's testimony related to Glover's condition, and was unconvinced only by Dr. Miller's non-committal "bottom-line" judgment about Glover's ability to perform non-sedentary work on a sustained basis.

Furthermore, the record shows that there is a logical bridge between the medical evidence and the ALJ's conclusion about Glover's RFC. *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). He considered the combined effects of her impairments (including obesity) on her respiratory and musculoskeletal systems, Glover's and the medical experts' testimony, and the

medical records she had submitted. He noted that her diagnostic evaluations "were essentially benign" and her diagnostic work-ups were thorough. (AR 22.) He explained that he did not credit Glover's testimony about the frequency and duration of her asthma attacks, not only because her falsification of a nursing certificate (not to mention lying about her GED) demonstrated her willingness to lie, but because it was unsupported by her medical records. (AR 24.) Instead, the ALJ credited Dr. Miller's testimony that Glover's asthma was not severe, her attacks were infrequent, she had normal air-exchange studies, and that, although her pulmonary tests showed somewhat decreased function, they were unreliable. (AR 22.) As for Glover's claimed difficulty walking, the ALJ credited Dr. Miller's testimony that the medical evidence suggested anatomical abnormalities that would produce some pain, but not as much as she alleged, and that the pain would decrease with movement. (AR 22.) He added that the medical evidence did not support her complaints of lower back pain. (AR 22-23.) Finally, the ALJ was unconvinced that Glover had left her video-store job—which he considered light work—because she could not stand long enough, as her documented complaints of knee pain arose later. (AR 23.) Accordingly, the ALJ concluded that Glover could perform light work that would not involve concentrated exposure to pulmonary irritants or temperature extremes. (AR 23.) Because the evidence adequately supports that conclusion, this court will not disturb it.

Glover raises a number of new challenges to the ALJ's decision in her reply brief. But she forfeited these arguments by failing to raise them in her opening brief. *See Hess v. Reg-Ellen Mach. Tool. Corp.*, 423 F.3d 653, 655 (7th Cir. 2005); *United States v. Feinberg*, 89 F.3d 333, 339 n.3 (7th Cir. 1996). Nevertheless, in the interest of completeness, the court briefly will address her arguments.

First, Glover argues that the ALJ erroneously attributed her alleged difficulty climbing stairs to deconditioning, without basing this conclusion on medical evidence. But this mischaracterizes the ALJ's opinion; the ALJ merely noted that, *if* deconditioning affects Glover's ability to climb stairs, he would not consider it because it is not a medically determinable impairment. (AR 21.) The ALJ then relied on Dr. Miller's testimony in assessing the effects of Glover's asthma and arthritis on her exertional capabilities. (AR 22.) Thus, the ALJ did not provide his own medical judgment; he relied on the medical evidence. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Second, Glover argues that the ALJ made a medical judgment in concluding that "diagnostic evaluations were benign," and that "the record showed a thorough work-up." She says the ALJ evaluated only x-rays of her knees and lumbar spine, and did not account for a notation by her primary-care physician that she needed imaging studies as of May 19, 2003. But the ALJ did acknowledge that notation, and he made his assessment after considering her entire medical record, which included MRIs of the lumbar spine and hips dated April 2005. (AR 463-66.) The record also included evaluations of multiple x-rays, ranging in date from August 2003 to March 2005, of Glover's knees, chest, left shoulder, cervical spine, lumbar spine, pelvis, and hip. (AR 329, 340, 424, 438, 462.) Accordingly, the evidence clearly supports the ALJ's conclusion that Glover had received a thorough work-up.

Third, Glover argues that the ALJ's conclusion that Glover had testified falsely when she said she did not have health insurance was erroneous. Glover says the ALJ clearly misread the record, which says Glover was "self pay" when she was admitted to Elmhurst Memorial Hospital on February 24, 2002. (AR 237- 246.) Although the ALJ appears to have erroneously identified

Glover as insured for that visit, later medical records for hospital admissions in 2003, 2004, and 2005 all indicate that she had a "PPO" or "Access DuPage" insurance. (AR 270, 327, 338-39, 342, 344, 357, 375, 469.) Thus, the evidence clearly supports his conclusion that she had insurance or access to free medical care.

In a related point, Glover argues that the ALJ's conclusion about her access to medical care is irrelevant to his determination of her residual functioning capacity. The court disagrees. Given the ALJ's conclusion that Glover suffered from periodic asthma attacks that required medical treatment, her ability to access medical care was indeed relevant.

Also irrelevant, argues Glover, are the ALJ's findings that (1) she had not complained of knee pain until April 2003, even though she testified that she quit a job at a video-rental store in 2002 because she could not stay on her feet long enough, and (2) she did not adequately prepare for a colonoscopy in May 2004, despite prior experience as a nurse. Again, the court disagrees. The ALJ was entitled to use these and other inconsistencies, in conjunction with Glover's falsification of a nursing certificate, as a basis for his decision not to credit her testimony about the severity of her impairments. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).

B. Remand to Consider New Evidence

Glover next argues that the court should order a remand so that the ALJ can consider the mental-health records she submitted, which relate to treatment she received from October 17, 2004 through June 8, 2005, and from February 15, 2006 through March 23, 2006. She argues that the evidence—which shows diagnoses of severe, recurrent major depressive disorder, with psychosis, along with an older diagnosis of post-traumatic stress disorder —is material, and that

there was good cause for not presenting the evidence earlier because she inadvertently sent it to the wrong address after her administrative hearing.

Upon a showing that there is new evidence that is material, and that there is good cause for the applicant's failure to incorporate such evidence into the record in a prior proceeding, the court may order additional evidence to be taken before the Secretary. 42 U.S.C. § 405(g), sent. 6. Evidence is new under §405(g) if it was "not in existence or available to the plaintiff at the time of the administrative proceeding." *Schmidt*, 395 F.3d at 742 (citation and quotation marks omitted); *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). Where evidence is in existence prior to the hearing or the ALJ's decision, or relates to information available at that time, it is not "new." *See Sample*, 999 F.2d at 1144; *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003). Evidence is "material" if there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt*, 395 F.3d at 742 (internal quotation marks and citation omitted).

Here, although the evidence may indeed be material, it is clearly not new. Glover's mental-health records predate the ALJ's decision of October 23, 2006, and, with one exception, predate the March 7, 2006 hearing. Moreover, Glover has not argued that the exception—a psychiatric progress note dated March 23, 2006—diagnoses the onset of a new impairment, or suggests a substantial change in a preexisting condition. (AR 511-12.) Rather, the report reiterates prior diagnoses and discusses her progress under treatment. *Cf. Jens*, 347 F.3d at 214 (finding evidence not new because information in report written after hearing did "not provide a new perspective on the information that was available to [the claimant] before his hearing[.]").

Moreover, Glover has not shown that the rest of the evidence was unavailable to her prior to the hearing. That the ALJ did not have access to any of the information in the mental-health reports at the time of the hearing does not, as Glover contends, make it "new." She argues that the Seventh Circuit's case-law stands only for the proposition that she may not rely on evidence that is derivative of information that was available to the ALJ. But that reading is unpersuasive. Section 405(g) remands are appropriate only for evidence that was not in existence, or not available *to the claimant*, prior to the hearing. *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *Schmidt*, 395 F.3d at 742; *Jens*, 347 F.3d at 214. Thus, Glover's awareness of and access to the evidence at the time of the hearing forecloses her argument that it is "new." *See Schmidt*, 395 F.3d at 742-43. Moreover, that her attorney did not know about or possess the records prior to the hearing is not enough to show that they were unavailable to Glover. *See Kelly v. Shalala*, No. 92 C 5759, 1992 U.S. Dist. LEXIS 12436, *44-45 (N.D. Ill. Sept. 8, 1993) (Pallmeyer, J.) (evidence is not new merely because attorney was not aware of it at time of hearing).

Even if any or all of the evidence could be considered "new," moreover, Glover has not demonstrated good cause for its late submission. First, her initial failure to submit evidence prior to the hearing clearly was the result of a lack of communication between her and her attorney, which does not support a finding of good cause. *See Tarrence v. Shalala*, No. 92 C 6306, 1993 U.S. Dist. LEXIS 13874, *28-29 (N.D. Ill. Oct. 1, 1993) (Bucklo, J.) (declining to find good cause where claimant's and claimant's attorney's lack of diligence in ensuring that attorney was informed could have assured that records were submitted before hearing); *Ford v. Barnhart*, No. 06-0220, 2006 U.S. Dist. LEXIS 88889, at *6 (E.D. Pa. Dec. 7, 2006) (noting that, "even if Ford's attorney was not aware of the letters in time to submit them to the ALJ,

-16-

claimants, themselves, have a duty to exercise reasonable diligence[.]"). Second, even after her attorney learned about the records, Glover failed to meet the ALJ's 30-day deadline for post-hearing submissions. Glover says that her attorney's failure to submit the evidence was the result of inadvertence and did not reflect an attempt to manipulate the administrative process, noting that her attorney "assumed, because he never heard from Federal Express that the records were not delivered, that the ALJ had received Ms. Glover's mental health records prior to making his decision." (R.20, MSJ 2, n.1.) But this glosses over the fact that the submissions would have been untimely even if they had been sent to the correct address. In short, Glover was given "ample opportunity" to submit the records before and after the hearing, but did not. *Schmidt*, 395 F.3d at 743. Because Glover has not offered any excuse for the late submission, the court cannot conclude that her failure to submit the evidence was for good cause.

## IV. CONCLUSION

For the foregoing reasons, the court **DENIES** Glover's motion for summary judgment and **GRANTS** Commissioner Astrue's motion for summary judgment.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **March 30, 2009**